Opinion issued March 23, 2006


















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-04-00922-CV
__________
 
PETER J. LEDIG, Appellant
 
V.
 
DUKE ENERGY CORPORATION AND DUKE ENERGY TRADING AND
MARKETING, L.L.C., Appellees
 

 
 
On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2003-23230
 

 
 
O P I N I O N
          Appellant, Peter J. Ledig, challenges the trial court’s rendition of summary
judgment in favor of appellees, Duke Energy Corporation (“Duke Energy”) and Duke
Energy Trading and Marketing, L.L.C. (“DETM”), in his suit for “unjust enrichment,
rescission of contract, breach of contract, misrepresentation, and defamation,”
brought after DETM terminated his employment. In four issues, Ledig contends that
the trial court erred in granting partial summary judgment in favor of appellees
because genuine issues of material fact exist regarding whether his election, made
while employed by Duke Energy North America (“DENA”), to exchange 50% of any
bonus he might receive in 2001 for Duke Energy stock options applied to the bonus
he received from DETM following his transfer to DETM in 2001; whether “the
illusory nature of the [election] agreement precludes summary judgment on [his]
equitable claims”; whether DETM was required to pay Ledig a bonus for the full year
of 2001, rather than a pro-rated bonus; and whether “libelous statements published
by [a]ppellees defamed [a]ppellant given that a reasonable reader could reasonably
believe them to be true.” We affirm. 
Factual and Procedural Background
          On December 29, 2000, while employed by DENA, a non-party to this lawsuit,
Ledig elected to exchange 50% of any bonus he might receive in 2001 for Duke
Energy stock options. Ledig made this election by signing the “Short Term Incentive
Exchange Program Election Form 2001.” The front page of the election form
instructed Ledig to “[c]omplete and submit this form no later than Dec. 29, 2000, to
make your election under this Program for 2001” and further stated that “[e]lections
that you make to forgo bonus in exchange for stock options will remain in effect for
subsequent years, unless you are no longer eligible for the Program or make a change
during a subsequent election period.” The election form provided the following
cautionary instruction: “Because your choices under this Program have significant
financial implications, we encourage you to review your Program brochure and share
the information with your financial or tax advisor.” By signing this form, Ledig
acknowledged the following:
I hereby authorize Duke Energy to reduce my bonus . . . as I elected on
this form. I understand . . . that if I forgo bonus under the Short-Term
Incentive Exchange Program, I will be granted a stock option under the
Duke Energy Corporation 1998 Long-Term Incentive Plan in exchange,
with the number of shares and exercise price of my stock option to be
determined on the grant date. I further understand that if my Duke
Energy employment terminates or I become ineligible for the Program
before the stock option is granted, my election to forgo bonus will
automatically be cancelled. . . . I confirm that I have been given copies
of the Short-Term Incentive Exchange Program brochure. . . . I also
understand that my election[] to . . . forgo bonus to be earned in 2001 in
exchange for a stock option under the Program [is] irrevocable after
Dec. 29, 2000, will take effect Jan. 1, 2001, and will continue for
subsequent years as long as I remain eligible unless I file a change in
a subsequent election period.
 
(Emphasis added). The Duke Energy Short Term Incentive Exchange Program (the
“Program”) brochure, which described the restrictions of the Program, and which
Ledig conceded receiving prior to signing the election form, provided
          YOUR ELECTION MUST BE MADE IN ADVANCE AND IS
IRREVOCABLE 
 
          Participating in this program gives you certain tax advantages, but
also imposes some restrictions. For example, the bonus that you
exchange for stock options will not be subject to current income taxes. 
To preserve this tax advantage, however, you must decide about
participating in the program before the beginning of the period during
which you bonus is earned. 
 
          Your agreement to make this exchange is irrevocable. After the
annual election deadline, you cannot cancel the agreement and receive
the cash bonus you elected to forgo. However, if your Duke Energy
employment terminates before the option is granted, your election to
forgo bonus is automatically cancelled.
 
The brochure further provided
          To participate in the program, you must have earned a bonus
under the short term incentive plans applicable to your business unit. 
Below is a list of plans that determine how you become eligible for
bonuses and the amount you may receive. These plans are incorporated
by reference into this program. 
 
Included in this list of nine plans were (1) the Duke Energy International/Duke
Energy North America Annual Incentive Program (the “DENA Plan”) and (2) the
Duke Energy Services Trading Pool Plan (the “DETM Plan”).
          Ledig testified that, in April 2001, he left his position with DENA and began
employment with DETM as the Vice President of Eastern Gas Trading. His election
to exchange 50% of his 2001 bonus for Duke Energy stock options under the Program
was based on the fact that the DENA Plan was a corporate plan with limited bonus
potential and that his maximum bonus potential under the DENA Plan was
approximately 53% of his salary. After beginning employment with DETM, Ledig
determined that his election under the Program “no longer made economic sense”
because his bonus potential under the DETM Plan was over 700% of his salary. 
Thus, after beginning employment with DETM, he told Jackie Salinas, Director of
Human Resources, that he wanted to change his election from 50% to 0%. Salinas
told Ledig the he could not change his election due to an Internal Revenue Service
regulation. In early 2002, Ledig was awarded $1,500,000 for his 2001 bonus under
the DETM Plan and, based on Ledig’s election under the Program, DETM converted
50% of his bonus to Duke Energy stock options.
          Ledig further testified that, “in connection” with his move to DETM, he spoke
with his supervisor, Todd Reid, concerning whether his 2001 DETM bonus would be
pro-rated. According to Ledig, Reid assured him that he would receive a bonus for
the full year of 2001, despite the fact that Ledig commenced employment with
DETM, at the earliest, in April 2001. Ledig learned that Reid had received a bonus
for the full year of 2000 even though Reid started at DETM in May 2000, and Ledig 
knew from “personal observation” that another DETM employee, Tim Kramer,
received similar treatment with respect to his bonus for the year 2000. Ledig asserts
that his 2001 bonus was pro-rated, in violation of Reid’s promise and in contrast to
the past treatment of Reid and Kramer.
          In May 2002, in response to an inquiry from the Securities and Exchange
Commission (“SEC”), appellees conducted investigations into the company’s energy
trading practices, and, on August 1, 2002, following the conclusion of those
investigations, Ledig was removed from his management position with DETM. Ledig
asserts that on that day, DETM represented that he was being retained and would be
reassigned to a new job. However, Ledig’s employment was terminated after he
received his salary from DETM through November 2002. On or about August 1,
2002, appellees allegedly published statements referencing the discharge of
employees in connection with their investigation into energy trading practices. 
          Ledig filed suit, asserting multiple claims arising out of the above alleged
incidents. Pertinent to this appeal, we consider the claims made in counts one, four,
and five of Ledig’s second amended petition. In count one, labeled “rescission of
contract, misrepresentation, and unjust enrichment,” Ledig, in regard to his election
to exchange 50% of his 2001 bonus for Duke Energy stock options, asserts that he
made this election without knowledge that he would be transferred to DETM six
months later, “materially changing the amount of the bonus subject to the election.” 
Ledig also asserts that when he moved to DETM, he was told that he would not be
able to change his election. Ledig contends that “as a result of the vagueness of the
agreement and the mistake as to the amount subject to the election,” he is entitled to
rescission of the contract. In count four, labeled “breach of contract, unjust
enrichment, and misrepresentation,” Ledig, in regard to his contention that he is
entitled to receive a bonus for the full year of 2001 rather than a pro-rated bonus,
asserts that appellees had previously compensated other employees who had been
employed for only part of a year as if they had been employed for the full year. 
Although Ledig does not clearly assert in his petition why he is entitled to a bonus
based on a full year, he does, in his summary judgment response, allege that he had
an oral agreement with his supervisor to be paid a bonus based on the full year. In
count five, labeled “defamation,” Ledig alleges that he was falsely accused of (1)
directing traders to trade for volume and not for economic benefit, and (2) of not
cooperating in the investigation of the trading practices.


 Ledig asserts that the
“circumstances surrounding [his] disaffiliation with Duke are commonly known in
the market place and to his peers.”
          DETM filed a motion for partial summary judgment, attacking the claims
asserted by Ledig in counts one, four, and five of his petition.


 The motion was
labeled as a “traditional” and no-evidence motion. See Tex. R. Civ. P. 166a(c),
166a(i). Without specifying the grounds upon which it relied, the trial court granted
appellees’ summary judgment motion as to these claims.


 
Standard of Review
          To prevail on a Rule 166a(c) summary judgment motion, a movant has the
burden of proving that it is entitled to judgment as a matter of law and that there is no
genuine issue of material fact. Tex. R. Civ. P. 166a(c); Black v. Victoria Lloyds Ins.
Co., 797 S.W.2d 20, 23 (Tex. 1990); Farah v. Mafrige & Kormanik, P.C., 927
S.W.2d 663, 670 (Tex. App.—Houston [1st Dist.] 1996, no writ). We may affirm a
summary judgment only when the record shows that a movant has disproved at least
one element of each of the plaintiff’s claims or has established all of the elements of
an affirmative defense as to each claim. Am. Tobacco Co. v. Grinnell, 951 S.W.2d
420, 425 (Tex. 1997); Farah, 927 S.W.2d at 670. In deciding whether there is a
disputed material fact issue precluding summary judgment, proof favorable to the
non-movant is taken as true, and the court must indulge every reasonable inference
and resolve any doubts in favor of the non-movant. Randall’s Food Mkts., Inc. v.
Johnson, 891 S.W.2d 640, 644 (Tex. 1995); Lawson v. B Four Corp., 888 S.W.2d 31,
33–34 (Tex. App.—Houston [1st Dist.] 1994, writ denied). 
          When a summary judgment does not specify the grounds on which the trial
court granted it, the reviewing court will affirm the judgment if any theory included
in the motion is meritorious. Harwell v. State Farm Mut. Auto. Ins. Co., 896 S.W.2d
170, 173 (Tex. 1995); Summers v. Fort Crockett Hotel, Ltd., 902 S.W.2d 20, 25 (Tex.
App.—Houston [1st Dist.] 1995, writ denied). 
Election to Exchange Bonus for Stock Options
          In his first issue, Ledig argues that the trial court erred in granting appellees’
summary judgment on his claim for rescission of his election agreement to exchange
50% of his 2001 bonus for stock options because the agreement, signed when he was
an employee of DENA and was covered under the DENA Plan, did not bind him to
an election to exchange 50% of his 2001 bonus he received under the DETM Plan for
stock options. Ledig asserts that the DETM Plan refers only to DETM, not to DENA,
and that the election form he signed “refers only to DENA” and “makes no references
to DETM.” Ledig argues that a material issue of fact exists “as to the uniqueness of
the two plans,” and that, because the plans are separate, the irrevocability language
contained in the election form and the Program brochure is a non-issue. Also, within
his first issue, Ledig argues that the trial court erred in granting appellees’ summary
judgment on his claim for misrepresentation because Ledig also asserts that he was
misled by Salinas regarding his ability to change his election after transferring to
DETM and that he “presented more than a scintilla of evidence on the challenged
elements.”
          Contrary to Ledig’s arguments, there are no material fact issues surrounding
his election to exchange 50% of his bonus for stock options that “preclude summary
judgment” on his claims for rescission and misrepresentation. Ledig’s arguments
under his first issue are centered on the proposition that the DENA and the DETM
Plans are “separate.” However, regardless of whether these plans are separate or
unique, under the plain language of the election form and the Program brochure,
Ledig’s election applied to both the DENA and the DETM Plans.


 These documents
establish that any election made under the Program applied to bonuses earned under
any one of nine plans, including the DETM Plan and the DENA Plan. There is no
evidence supporting Ledig’s assertion that his election under the Program was
invalidated upon his transfer to DETM. It is clear that in order to participate in the
Program, Ledig was required to make his election in advance and that his election
was irrevocable after December 29, 2000. While the Program brochure provides that
an employee’s election is automatically cancelled if “Duke Energy employment
terminates before the option is granted,” it does not state that an employee’s election
is revocable or that it may be cancelled upon the employee’s transfer to another Duke
Energy business unit subject to the Program. It is of no significance that the election
form does not refer to any particular Duke Energy business unit or associated plan
because the brochure expressly states that the election applies to bonuses earned
under any one of nine plans, including both the DENA and DETM plans. Thus, the
summary judgment evidence establishes that Ledig’s election applied to any bonus
earned at DETM in 2001 and that Salinas did not make any misrepresentation to
Ledig when she informed him that he could not change his election under the
Program. 
          In regard to Ledig’s claim for rescission of contract, “as a general rule, a
mistake that justifies rescission must be a mutual, not a unilateral, mistake.” Cigna
Ins. Co. of Tex. v. Rubalcada, 960 S.W.2d 408, 412 (Tex. App.—Houston [1st Dist.]
1998, no pet.). However, equity may permit rescission based on a unilateral mistake
when “(1) the mistake is of so great a consequence that to enforce the contract would
be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the
mistake occurred despite ordinary care; and (4) the parties can be placed in status
quo, i.e., the rescission must not prejudice the other party except for the loss of the
bargain.” Id.; James T. Taylor & Son, Inc. v. Arlington Indep. Sch. Dist., 160 Tex.
617, 620, 335 S.W.2d 371, 373 (Tex. 1960).
          Here, there is no allegation of mutual mistake. To the extent that there is any
allegation of a unilateral mistake, it is only that Ledig did not recognize that his
election under the Program was irrevocable for the year 2001 and that his election
would apply to a number of different plans, including the DETM plan, in the event
that he was transferred to DETM in the year 2001. But this information was
disclosed in the Program documents that Ledig conceded receiving before making his
election. Thus, Ledig cannot show that enforcement of the terms of the Program
would be unconscionable or that he made a “mistake” despite the exercise of ordinary
care. Also, although Ledig testified that he would not have made this election had he
known that he would be transferred to DETM during the year 2001, this is a
“mistake” concerning a future event. A unilateral mistake based on a future event,
as opposed to an existing fact, is not the type of mistake that would typically permit
a party to void a contract. See City of Austin v. Cotten, 509 S.W.2d 554, 557 (Tex.
1974); Green v. Morris, 43 S.W.3d 604, 607 (Tex. App.—Waco 2001, no pet.) (citing
the Restatement and stating that “[m]any authorities, in dealing with mistake, draw
a distinction between mistakes concerning ‘past or present facts’ and those
concerning factual occurrences in the future”).


 We hold that Ledig’s claims for
rescission of contract and misrepresentation fail as a matter of law.
            In regard to Ledig’s claim for unjust enrichment, we note that, generally, “when
a valid, express contract covers the subject matter of the parties’ dispute, there can be
no recovery under a quasi-contract theory,” such as unjust enrichment. Fortune Prod.
Co. v. Conoco, Inc., 52 S.W.3d 671, 684 (Tex. 2000). “That is because parties should
be bound by their express agreements. When a valid agreement already addresses the
matter, recovery under an equitable theory is generally inconsistent with the express
agreement.” Id. Here, Ledig is bound by his express election to exchange 50% of his
bonus for stock options, and we hold that his unjust enrichment claim fails as a matter
of law. See id. at 683–85.
          Accordingly, we hold that the trial court did not err in granting appellees
summary judgment on Ledig’s claims for rescission of contract, misrepresentation,
and unjust enrichment arising out of his assertion that his election did not apply to his
2001 DETM bonus.         
          We overrule Ledig’s first issue.
Illusory Nature of AgreementIn his second issue, Ledig argues that the trial court erred in granting appellees
summary judgment “regarding the election of stock options because the agreement
supporting the election is itself illusory.” He asserts that the agreement provided
appellees “with an opportunity to avoid their promises and obligations regarding
stock options.”


 Ledig concludes that because the agreement was illusory, the trial
court erred in granting summary judgment on his claims against appellees for
quantum meruit and unjust enrichment. 
          The Program brochure provides, in pertinent part: 
Duke Energy Corporation reserves the right to change the program in
any respect, including terminating the program or discontinuing an
employee’s eligibility, at any time. Such a change may result in no grant
of a stock option that has not been granted prior to the change, and the
associated bonus exchange election being cancelled. 
 
          Ledig’s argument is misplaced. Here, appellees simply provided Ledig with
an opportunity to elect to exchange a portion of any bonus he might earn during the
year 2001 for Duke Energy stock options, and he, with knowledge that his election
would be irrevocable in order to preserve certain tax advantages, elected to exchange
50% of his 2001 bonus for such options. Moreover, the Program brochure plainly
stated that participation in the Program was not “an offer or guarantee of
employment” and did not “create an employment contract.” Thus, it appears that the
parties simply agreed to change how Ledig was to be compensated in regard to any
bonus he earned in 2001. See Hathaway v. Gen. Mills, Inc., 711 S.W.2d 227, 229
(Tex. 1986) (holding that when employer notifies employee of change to at-will
employment contract and employee “continues working with knowledge of the
changes, he has accepted the changes as a matter of law”).


 
          Although appellees could have terminated the Program or cancelled Ledig’s
eligibility, appellees could have also terminated Ledig’s employment or he could have
quit. In fact, pursuant to the terms of the Program, if appellees had terminated
Ledig’s employment or if Ledig had quit before the options were granted, Ledig’s
election to forgo his bonus in exchange for stock options would have been
automatically cancelled and Ledig would have received any bonus to which he was
entitled. Yet, Ledig continued to work for appellees, even after Ledig was told that
he could not change his election and that he would be compensated, in part, with
stock options, in the event he earned a bonus.
          In support of his argument that he should be able to proceed with his equitable
claims of unjust enrichment and quantum meruit because the stock option agreement
was illusory, Ledig relies on J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223 (Tex.
2003), and In re Halliburton Co., 80 S.W.3d 566 (Tex. 2002). However, these cases,
which deal with an employer’s effort to compel arbitration of employee claims, are
substantively distinguishable. Here, appellees are not bringing suit to enforce, or to
void, their agreement to provide stock options to Ledig pursuant to Ledig’s election. 
Rather, Ledig is contending that, after being given the opportunity to make an
irrevocable election for tax advantages, after making that election in writing and
confirming that he understood that the election was irrevocable, after subsequently
being informed that he could not change his election following his transfer of
employment, and after continuing to work for appellees and earning and receiving his
bonus, he is now entitled to void his election and compel appellees to compensate
him in cash. J.M. Davidson and Halliburton do not support Ledig’s contention.
          Despite Ledig’s claim that appellees had the “opportunity to avoid their
promises and obligations regarding stock options,” either by terminating the Program
or by terminating Ledig’s employment, appellees honored his election and, pursuant
to the terms of the Program, exchanged a portion of Ledig’s bonus for stock options. 
Accordingly, we reject Ledig’s argument concerning the illusory nature of the
agreement and hold that the trial court did not err in granting summary judgment on
Ledig’s claims for quantum meruit and unjust enrichment on these grounds. 
          We overrule Ledig’s second issue.
Pro-Rated BonusIn his third issue, Ledig contends that “fact issues surrounding [his] pro-rata
award preclude a summary judgment on [his claim for] breach of contract.”


 Ledig
asserts that his supervisor, Todd Reid, assured him that he would receive a bonus
from DETM for the year 2001 based on an entire year of service, despite the fact that
Ledig began employment with DETM in April 2001.


 Ledig also asserts that Reid
and Tim Kramer, another employee, had previously been paid bonuses for the year
2000 based on a full year of service, even though Reid and Kramer had commenced
employment with DETM in May 2000. Finally, Ledig cites an e-mail from an
employee in Duke Energy’s human resources department allegedly indicating that
Mike Kimner, another DETM employee, was promoted in the year 2001 to the
position of President of Duke Energy Merchants, a separate Duke Energy business
unit, but Kimner was allowed to remain in the DETM Plan for 2001. 
          The “Duke Energy Services Trading Pool Plan” expressly provides that “[a]n
employee hired after January 1, 2000 will be compensated with a pro-rated award
based on hire date.” The DETM Plan further provides
          If an employee begins employment after the commencement of a
year, or an employee transfers during the year to another Duke Energy
affiliate, performance achievement will be awarded pro rata. All pro
rata calculations under this Plan shall be based on the amount of full-time employment completed compared to the full year.
There is nothing in the Plan providing Reid with the authority to alter the terms of the
Plan. Rather, the Plan provides
          This summary states the complete Plan. Any other statements,
whether verbal or written, which are inconsistent with the terms and
conditions set forth in this summary, are unauthorized by the Company. 
Any amendments or modifications to the Plan shall be in writing and
designated as such.
 
          When, as here, the parties have concluded a valid integrated agreement, the
parol evidence rule precludes enforcement of a prior or contemporaneous inconsistent
agreement. Gonzalez v. United Carpenters & Joiners, 93 S.W.3d 208, 211 (Tex.
App.—Houston [14th Dist.] 2002, no pet.). Parol evidence is only admissible to
show “(1) the execution of a written agreement was procured by fraud, (2) an
agreement was to become effective only upon certain contingencies, or (3) the
parties’ true intentions if the writing is ambiguous.” Id. Here, Ledig specifically
testified that, in early 2001, in connection with his move to DETM, he spoke with
Reid, his supervisor, and was assured that he would receive a bonus for the full year
of 2001. Ledig is not asserting that the DETM Plan was procured by fraud, that the
DETM Plan was to become effective only upon certain contingencies, or that the Plan
was ambiguous. Even accepting Ledig’s testimony as true, that Reid promised him
that he would receive a bonus for the full year of 2001, the terms of the Plan, which
expressly provide that Ledig would be entitled to a pro-rated bonus, control
appellees’ obligations under the Plan.


 
          In regard to appellees’ alleged treatment of other employees, Ledig’s assertion
that Reid and Kramer were granted bonuses for the entire year of 2000 is not
supported by competent summary judgment evidence.


 Finally, the e-mail that
Ledig asserts establishes that another DETM employee was permitted to participate
in the DETM Plan after transferring to another Duke Energy business unit has no
relevance to this case and does not support Ledig’s breach of contract claim. 
          We hold that the trial court did not err in granting summary judgment on
Ledig’s breach of contract claim arising out of his allegation that he was entitled to
a bonus for the full year of 2001, rather than a pro-rated bonus. 
          We overrule Ledig’s third issue.
Defamation
          In his fourth issue, Ledig contends that “libelous statements published [] by
appellees defamed him given that a reasonable reader could reasonably believe them
to be true.” In his brief, Ledig cites two statements in support of his defamation
claim. First, Ledig asserts that appellees, through counsel representing them in an
investigation conducted by the SEC, stated that “Duke has taken certain other
personnel actions . . . [and] reorganized its trading and marketing operations to ensure
proper leadership and management are in place . . . .”


 Second, Ledig asserts that
appellees published a report which provided, “Duke states that most of the senior
management in the Houston office, including all who participated in the inaccurate
reporting, are no longer with the company.”


 Appellees contend that the trial court
properly granted summary judgment on Ledig’s defamation claim because “he had
no evidence from which reasonable minds could find that [appellees] published false
and defamatory statements about him.” (Emphasis in original). 
          In order to prevail on his defamation claim, Ledig must establish that the
statement referred to him. Newspapers, Inc. v. Matthews, 161 Tex. 284, 289, 339
S.W.2d 890, 893 (Tex. 1960); Delta Air Lines, Inc. v. Norris, 949 S.W.2d 422, 427
(Tex. App.—Waco 1997, writ denied). A person is referred to in a defamatory
statement if he is named in the statement or if those who know the person would
understand that the statement was referring to the person. Matthews, 339 S.W.2d at
893; Am. Broad. Cos. v. Gill, 6 S.W.3d 19, 34 (Tex. App.—San Antonio 1999, pet.
denied). Whether a plaintiff is referred to in a statement is a question of law for the
court. Am. Broad. Cos., 6 S.W.3d at 34. This question is submitted to a jury only if
the contested language is ambiguous or of doubtful import. See Denton Pub. Co. v.
Boyd, 460 S.W.2d 881, 884 (Tex. 1970).
 
          Appellees’ statements that Duke had “taken certain other personnel actions”
and “reorganized its trading and marketing operations to ensure proper leadership and
management” do not make any reference to Ledig, directly or indirectly, and are
insufficient, as a matter of law, to be capable of defamatory meaning. Ledig concedes
that the second statement, that “most of the senior management in the Houston office,
including all who participated in the inaccurate reporting, are no longer with the
company,” does not directly refer to him. However, Ledig asserts that the statement
refers to him because “he is unquestionably a member” of Duke’s senior management. 
          Texas courts have routinely held that “a member of a group has no cause of
action for a defamatory statement directed to some or less than all of a group when
there is nothing to single out the plaintiff.” Eskew v. Plantation Foods, Inc., 905
S.W.2d 461, 462 (Tex. App.—Waco 1995, no writ); see also Huckabee v. Time
Warner Entm’t Co., 19 S.W.3d 413, 429 (Tex. 2000) (holding that family law judge
could not bring defamation claim because general criticism of family law courts was
not directed at particular judge). In Eskew, Plantation Foods conducted an
investigation into irregularities in its maintenance department. 905 S.W.2d at 461. 
At the conclusion of the investigation, Plantation Foods fired several employees. Id. 
The local newspaper published an article in which a representative of Plantation
Foods stated, “I don’t think everyone we let go had something to do with this. But
some of those we let go, we think, were involved.” Id. at 462. Three employees who
were terminated brought suit, alleging that although they were not named in the
article, anyone knowing them would be aware that the article referred to them. Id. 
The court entered summary judgment in favor of Plantation Foods, noting that the
statement did not single out the plaintiffs or “malign the entire group of persons
terminated.” Id.
          Here, the statement at issue indicates that most of the senior management,
including those who had engaged in the inaccurate reporting, were no longer with
Duke Energy. Appellees did not assert that all who were dismissed were involved in
the inaccurate reporting, and thus did not malign the entire group of persons
terminated. In fact, the statement suggests that those involved in the inaccurate
reporting were only a subset of the senior management that were dismissed. We hold
that this statement, like the first, does not refer to Ledig and is insufficient, as a matter
of law, to be capable of defamatory meaning.


 Accordingly, we hold that the trial
court did not err in granting summary judgment on Ledig’s defamation claim.
          We overrule Ledig’s fourth issue.
 
 
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Nuchia, Jennings, and Higley.